# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# SOUTHERN DIVISION
# PIKEVILLE

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION** |
| | **NO. 7:18-CR-7-KKC** |
| Plaintiff, | |
| V. | **OPINION AND ORDER** |
| **ASSAD NASR,** | |
| Defendant. | |

\*\* \*\* \*\* \*\* \*\* \*\*

This matter is before the Court on Defendant Assad Nasr's motion to suppress (DE 35) evidence seized by the government pursuant to a search warrant. For the following reasons, the Court will deny the motion.

Nasr is a pharmacist and, during the relevant time period, was the owner of Kentuckiana Pharmacy, which is in Jeffersonville, Indiana. He is charged with one count of conspiring with others to dispense oxycodone outside the scope of professional practice and not for a legitimate medical purpose. With this motion, he asks the Court to suppress certain evidence that the government seized from the pharmacy pursuant to a search warrant.

In his motion, Nasr argues that there are three problems with the search warrant that authorized the search of his pharmacy. First, he argues that the affidavit filed in support of the search warrant does not establish the requisite "probable cause." Second, he argues that statements made by Detective and DEA Task Force Officer Brian Metzger in the affidavit that he submitted in support of the search warrant were "materially misleading." Third, he argues that the warrant that the magistrate judge issued was overbroad. (DE 35, Motion at 3.)

The Court will first address probable cause. The Constitution's Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause" means a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quotations and citations omitted).

To meet the nexus requirement of probable cause, "the circumstances must indicate why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004). "In other words, the affidavit must suggest 'that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of the property is suspected of a crime.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir.2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

"When making a probable cause determination, a court is limited to the four corners of the affidavit." *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013). Accordingly, no hearing on this issue is necessary. *See United States v. Baechtle*, No. 2:13-CR-20054-SHM, 2015 WL 893348, at *7 (W.D. Tenn. Mar. 2, 2015).

The affidavit submitted in support of the warrant here establishes established probable cause to believe that evidence of the illegal distribution of controlled substances would be found at Kentuckiana. It set forth the following facts:

- Kentucky State Police Trooper Zach Bryson contacted Detective Metzger on about June 14, 2016 and informed him that Darryl Williams, a resident of Pike County, Kentucky, had been paying for a large group of people to travel to a pain clinic in

2

Virginia. The affidavit refers to this group of people as Williams' drug-trafficking organization ("DTO").

- For the members of his DTO, Williams covered the costs of their travel to the Virginia pain clinic, the doctor's visits, and filling the prescriptions. In return, Williams received half of the pills that they were prescribed by the pain clinic. After Williams learned he was being investigated by the Kentucky State Police, he contacted Trooper Bryson and agreed to cooperate.

- Detective Metzger, DEA Special Agent Iain Dalrymple, and Trooper Bryson met with Williams at the KSP post in Pikeville on June 17, 2016. Williams told the officers that he had taken several people to Dr. Joel Smithers' office in Martinsville, Virginia, and that Dr. Smithers had provided Williams a list of pharmacies where Williams and his group could fill the prescriptions that Dr. Smithers issued to them. One of the listed pharmacies was Kentuckiana Pharmacy in Jeffersonville, Indiana.

- Williams advised the officers that Dr. Smithers wrote him and his group prescriptions for oxymorphone and oxycodone pills. Williams stated that he would take three prescriptions at one time into Kentuckiana and obtain the pills. Then he would sell the pills to make enough money to fill more of the prescriptions. Williams stated he had filled prescriptions at Kentuckiana in the names of seven other individuals who were members of his DTO.

- On July 11, 2016, Detective Metzger, Special Agent Dalrymple, and DEA Task Force Officer Shelby Sloane again met with Williams in Pike County, Kentucky. Williams informed the officers that he had routinely filled prescriptions at Kentuckiana that were written by Dr. Smithers. He stated that he had contacted the Kentuckiana pharmacist by cell phone, and he provided the officers with the cell phone number. The officers determined that the cell phone number was registered to Kentuckiana.

- On July 12, 2016, the officers met with Williams and his girlfriend, Lora Kicklighter, who informed the officers that she had obtained prescriptions from Dr. Smithers and had them filled at various pharmacies, including Kentuckiana. She stated that none of the pharmacies ever asked for information concerning medical insurance or medical cards. She stated that she and Williams had used Kentuckiana on multiple occasions.

- Kicklighter stated that Williams knew the Kentuckiana pharmacist well enough that Williams texted him prior to driving to Indiana to make sure the pharmacy had enough pills to fill the prescriptions.

- Kicklighter stated that Kentuckiana charged Williams $1,400 cash to fill a prescription for oxycodone 30 mg. Kicklighter stated that if a person had multiple prescriptions, some for narcotics and some for non-narcotics, Kentuckiana would allow the person to fill only the prescription for narcotics.

- On July 15, 2016, Detective Metger and Special Agent Dalrymple again met with Kicklighter and Williams. Kicklighter agreed to make a "controlled visit" with Dr. Smithers to obtain a prescription. She also agreed to fill the prescription at Kentuckiana.

- At this meeting, Williams permitted the officers to download the contents of his cell phone. The phone contained text messages between Williams and Nasr dated between June and July 2016. Detective Metzer set forth the text of the messages in the affidavit. In them, Williams inquires at various times about whether Nasr will have certain pills in stock. Nasr tells Williams to let him know exactly what he needs so he will have them. In one text, Williams states that he has five people who will have prescriptions the following Tuesday. Williams states that these people do not want to fill their prescriptions at the "new and cheaper pharmacy because they heard they will pill count[]."

- Williams advises Nasr in the texts that John Harlow, Bryan Harlow, Geneva Bowman, Samuel Hubbard, and Michelle Smith obtained prescriptions. Williams states, "so you will need 250 40s. 60 oxymorphone 30s" and "then 120 Roxy 30s and 150 Roxy 20s." Williams clarifies he will need all of that Tuesday morning.

- On the morning of July 19, 2016, law enforcement officers again met with Kicklighter and Williams. Kicklighter sent a text to Nasr regarding the number of pills she would need. She was outfitted with audio and recording devices and provided with $6,000 and the prescriptions that five members of the Williams DTO had obtained from Dr. Smithers. Kicklighter went into the pharmacy late that afternoon. Nasr arrived at the pharmacy shortly after.

- Kicklighter later met with law enforcement officers and gave them the pills she obtained from Kentuckiana. With the pills was a handwritten note that Kicklighter stated Nasr wrote. The note stated that the pharmacy owed Sammy Hubbard "a bottle of pills (60 count)," and that another bottle the pharmacy had filled was six pills short.

- On January 25, 2017, DEA Officer Matthew Keller informed Detective Metzger that he had identified another DTO that had obtained prescriptions from a nurse practitioner located in Johnson City, Tennessee. The members of that DTO had also filled the prescriptions at Kentuckiana, which was a five-hour drive from Johnson City.

- On April 18, 2017, Metzger and DEA Agent Douglas Dalrymple met with Michael Robinette, a member of Williams' DTO. Robinette stated that he had been to Kentuckiana about six times to fill prescriptions written by Dr. Smithers. Robinette stated he went to the pharmacy with Michael Bowe, another member of Williams' DTO, about five times and once by himself. He stated he always paid cash. He stated that Williams would contact Nasr to make sure he had enough pills to fill the prescriptions of Robinette and Bowe. Williams told Robinette that Robinette should

call Williams if he ever went to Kentuckiana to fill prescriptions and Nasr was not there. Williams stated he would call Nasr to come to the pharmacy.

There is no question that the information set forth in the affidavit establishes a fair probability that evidence of the distribution of oxycodone outside the scope of professional practice and not for a legitimate medical purpose would be found at Kentuckiana. The affidavit indicates that Williams and members of his DTO traveled multiple times from Kentucky to Dr. Smithers in Virginia, which is more than a four-hour trip. They then traveled multiple times to Kentuckiana in Jeffersonville, Indiana, where Nasr permitted Williams and his DTO to fill at one time multiple prescriptions for controlled substances written by the same doctor in Virginia.

Nasr appears to argue that the affidavit does not establish probable cause because it does not assert that he knew that Williams was diverting prescription drugs or that he knew that Dr. Smithers was illegitimately prescribing drugs. Nevertheless, a magistrate judge could reasonably infer from just the facts set forth above that Nasr knew he was filling prescriptions that were not for a legitimate medical purpose.

Nasr argues that the affidavit does not set forth probable cause because Kicklighter's controlled purchase of pills from him was insignificant, and because the officers ultimately discovered that Kicklighter attempted to take some of the pills obtained from Nasr for herself. Kicklighter's purchase was significant to the probable cause determination, however, because it demonstrated that, during one visit to Kentuckiana, Kicklighter was able to fill prescriptions for controlled substances written to five different people. All five prescriptions were written by Dr. Smithers. The fact that Kicklighter later attempted to steal some of the pills does not alter the fact that Nasr filled the prescriptions.

Nasr argues that the text messages between Williams and Nasr are insignificant to the probable cause determination because they are simply "routine" communications between a

pharmacist and patient. (DE 35, Mem. at 20.) However, the texts demonstrate Nasr's willingness to fill, at Williams' behest, prescriptions for controlled substances written to five different people. Further, Williams informed Nasr that the five people did not want to fill their prescriptions at another pharmacy because they feared that pharmacy was "pill counting."

Nasr argues that the information contained in the affidavit is false or misleading, and he also argues that Detective Metzger omitted material information from the affidavit.

If a defendant can prove at a hearing by a preponderance of the evidence that an officer deliberately or recklessly set forth false information in an affidavit submitted in support of a search warrant, the Court must set that information aside in determining whether the affidavit establishes probable cause to support the search. *United States v. Campbell*, 878 F.2d 170, 171–72 (6th Cir. 1989) (quoting *Franks v. Delaware*, 438 U.S. 154, 156 (1978)). And if the remaining allegations in the affidavit do not establish probable cause, then the Court must void the search warrant and exclude any evidence seized pursuant to it. *Id.* at 171-72.

Thus, in order to be entitled to a hearing on the veracity of statements in a search warrant affidavit, the Court must find two conditions are met. First, the Court must find "a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false." *Id.* at 171. Second, the Court must find that, after striking the allegedly false material in the affidavit, the remaining content would not support a finding of probable cause. *Id.* If both these conditions are not met, then there is no need for a hearing because the evidence seized pursuant to the warrant could not be suppressed.

Neither condition is met here. Nasr has not made a showing that any portion of the affidavit is deliberately or recklessly false. He argues that the section of the affidavit titled "Background" is irrelevant to Nasr and Kentuckiana. He points out that the background section explains how

controlled substances are diverted to illegal use through the acts of practitioners, often working at pain clinics, who write prescriptions for controlled substances that are not medically necessary. Nasr argues that Kentuckiana does not fit the description of a "pain clinic."

But the background section of the affidavit does not assert that Kentuckiana is a pain clinic. In fact, it makes no assertions about Kentuckiana at all. Instead, the background section explains the current problem of large-scale diversion of controlled substances from legitimate uses to illegal ones, and correctly explains that such diversion relies on both practitioners and pharmacists willing to engage in unethical and illegal acts.

Moreover, even if the Court were to set aside the entire background section, the affidavit still sets forth sufficient facts to establish probable cause. Not a single bulleted point set forth above was contained in the background section of the affidavit.

Nasr also makes some complaints about the section of the affidavit titled "Investigation," in which assertions about Kentuckiana are first made. (DE 35, Mem. at 17.) Nasr argues that Detective Metzger omitted material information from the investigation section.

"Although material omissions are not immune from inquiry under *Franks*, [the Sixth Circuit has] recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). This is because an inquiry into alleged material omissions "potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id* (quotations and citation omitted). To be entitled to a *Franks* hearing on an allegation of a material omission in an affidavit, the defendant must make "a preliminary showing that the government affiant engaged in deliberate falsehood or reckless

7

disregard for the truth in omitting information from the affidavit." *Id.* (quotations and citation omitted). And then he must show that, if the Court were to consider the omitted information, probable cause for the search would not exist. *Id.*

Nasr argues that the affidavit should have stated that the cell phone by which Nasr texted Williams was the phone number that Kentuckiana advertised to patients. The significance of the texts between Nasr and Williams is their content. The way that Williams received the cell phone number is not material to the probable cause determination. Nasr also argues that the affidavit should have included information indicating that, of the 41,900 prescriptions Kentuckiana filled between 2015 and 2018, only 78 were written by Dr. Smithers for controlled substances for members of the Williams DTO. (DE 35, Mem. at 5, 21-22). This omission has no impact on the probable cause determination because the distribution of controlled substances for illegitimate purposes by a pharmacist is illegal even if the pharmacist dispenses more drugs for legitimate purposes.

Accordingly, the Court will not conduct a *Franks* hearing to inquire into any of the alleged omissions from the affidavit.

Nasr also argues that the search warrant that the magistrate judge ultimately issued is overbroad because it authorizes the search and seizure of "just about anything imaginable: bank records, tax records, address books, utility bills, keys, records for 'precious metals,' customer lists, 'cellular telephones,' 'gas receipts,' 'rubber bands,' and so on." (DE 35, Mem. at 23.) He further argues that the warrant can be read to authorize the search and seizure of "any records. documents, programs, applications, and/or materials created, modified, or stored in any form." (DE 35, Mem. at 23.)

The Fourth Amendment provides that warrants shall "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Particularity 'eliminates the danger of unlimited discretion in the executing officer's determination of what is subject to seizure.'" *United States v. Greene*, 250 F.3d 471, 476–77 (6th Cir.2001) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir.1991)).

The search warrant does not authorize the seizure of "anything imaginable." The warrant authorizes the seizure of various particularly described items. Specifically, it authorizes the seizure of various items related to the sale or distribution of controlled substances; documents reflecting names, addresses, and telephone numbers; records of mail and telephone communications; firearms and accessories; records evidencing ownership of the premises; items demonstrating an association between Nasr, Dr. Smithers, Williams' DTO, and others suspected of the illegal diversion of controlled substances; items demonstrating Nasr's ownership of vehicles; U.S. currency; property subject to forfeiture; and documents related to Kentuckiana's billing of Medicaid, Medicare, and private insurance. This sufficiently limits the discretion of the executing officers.

For all these reasons, Nasr's motion to suppress (DE 35) the evidence seized from Kentuckiana pursuant to the search warrant is DENIED.

Dated January 6, 2020

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY